On cross-examination he said his car was going pretty fast when it reached that corner. The speed was on, but not the power. He had the car that time under control if the down car had stopped. He did not bring his car to a stop. When the two cars met, the down car was clear of the corner about 40 feet from it. He thought it was letting witness' car go by.

Defendant in its answer alleges that:

"Plaintiff alighted safely from the car descending Freret street, and, passing safely behind the said car which concealed him from the motorman of car No. 66 (the upper bound car), passed suddenly and rapidly across the street, and directly in front of said car in such manner and under such circumstances as made it impossible for the said motorman to perceive him in time to stop his car and avert the collision."

The jury decided the facts at issue in favor of the plaintiff, and the court affirmed its verdict. We see no reason to reverse the judgment on the facts. The judgment is affirmed.

---

(49 South. 709.)

No. 17,355.

ADVANCE THRESHER CO. v. ROGER.

(May 24, 1909. Rehearing Denied June 19, 1909.)

PRINCIPAL AND AGENT (§ 156*)—AUTHORITY OF AGENT—SALES—CONSTRUCTION OF CONTRACT.

　　Plaintiff sues for the specific performance by defendant of the obligations alleged to have been incurred by him under an order upon it to furnish and deliver to him certain machinery at the price and on the terms and conditions contained in a printed order, which a soliciting agent of the plaintiff submitted to him. The defendant himself and the agent signed the document, which was transmitted to the plaintiff company.

　　The machinery ordered was shipped and received by the defendant. On the face of the document signed by the defendant, the exact authority of the solicitor in respect to the proposed order and sale and the limitations upon his right to depart in any way from the terms and conditions of the printed order and sale were set out.

　　Defendant read the document before signing the same. The machinery sent to defendant was not found satisfactory to him and failed to meet the representations in respect to it which had been made to him by the agent. Denying that he was bound in any way under the order, this suit followed.

　　Before signing the order, the defendant obtained from the soliciting agent a written certificate to the effect that the order was given conditionally, that the machinery was to be shipped to defendant, and received by him subject to a trial by him of its merits and its efficiency to accomplish the work which he required, and that it was to be accepted only if found satisfactory. The certificate so signed by the solicitor agent was written on a separate piece of paper. Knowledge of the same was communicated to the plaintiff company neither by the agent nor by the defendant until after the machinery was received and had been found unsatisfactory. The trial court held defendant bound according to the terms of the printed order. He has appealed. The judgment is correct and is affirmed.

　　[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 156.*]

(Syllabus by the Court.)

Appeal from Twentieth Judicial District Court, Parish of Lafourche; Whitmel Pugh Martin, Judge.

Action by the Advance Thresher Company against Ernest Roger. Judgment for plaintiff, and defendant appeals. Affirmed.

Beattie & Beattie, for appellant. Joseph George Medlenka and Howell & Caillouet, for appellee.

Statement of the Facts.

NICHOLLS, J. The plaintiff alleged that on the 11th of June, 1906, it received an order from the defendant for the following list of machinery with regular fixtures furnished by the company, to. wit:

"18 H. P. Traction engine with coal burner, one corn husker shredder. 12 roll with wind stacker attached, one corn husker feeder for 12 roll husker, one corn husker shredder bagger, to be shipped from petitioner's factory at Battle Creek, about July 1, 1906, or as soon thereafter as possible, the said Ernest Roger to pay the freight and charges on the said machinery from the factory, and in addition to execute notes in favor of petitioner in the sum of twenty one hundred and eighty-seven dollars ($2,187.00) in the following amounts and payable on the following dates, to wit:

"One note for seven hundred and twenty-nine dollars due December 15, 1906.

"One note for seven hundred and twenty-nine dollars due December 15, 1907.

"One note for seven hundred and twenty-nine dollars due December 15, 1908.

"That the said notes were to be executed at the date of delivery of the machinery and to bear 8 per cent. interest per annum, interest payable annually, from date until paid. A copy of which order and contract is hereto annexed for reference, and greater certainty."

Petitioner further averred:

"That the said Ernest Roger ordered from petioner, and not specified upon the said order, one cab for the engine at the price and sum of $50, which amount was to be paid to petitioner in cash on delivery of the same.

"That it performed its part of the said contract and shipped to the said Ernest Roger in accordance therewith the said machinery and said cab. That the same was delivered to the said Ernest Roger on or about September 1, 1906, and that the same has come up to petitioner's warranty, and performed the services for which it was intended. That the said Ernest Roger, though repeatedly demanded to comply with his portion of the said contract, refused to do so, and, in consequence, it is entitled to a judgment condemning him to execute in its favor the notes described in the said contract, or else to pay to it the amount of damages suffered in consequence of this failure, which damage it declares to be the value of the said machinery, to wit, the sum of $2,187. That in addition to the said sum the said Roger is indebted unto petitioner in the sum of $50, being the value of the engine cab ordered and delivered on open account. It prayed that the said Ernest Roger be duly cited; that it do have judgment condemning the said Ernest Roger to perform and comply with the obligations which he had entered into, to wit, to execute in favor of petitioner, under date of September 1, 1906, or thereabout, his three certain notes, each for the sum of $729, bearing interest at the rate of 8 per cent. per annum from date, payable annually, due on or before December 15, 1906, December 15, 1907, and December 15, 1908, respectively, and to pay petitioner the additional sum of $50, with 5 per cent. thereon from September 1, 1906, until paid, being the value of the engine cab sold and delivered to the said defendant, or in default on the part of the said Ernest Roger to execute the notes in favor of petitioner; that he be condemned to pay petitioner as damages for failure to comply with his contract the sum of $2,187, with 8 per cent. thereon per annum from September 1, 1906, the said amount being the value of the machinery delivered in accordance with his written order of June 11, 1906, and the one engine cab."

Accompanying plaintiff's petition was an instrument purporting to be a copy of the agreement on which plaintiff declared, signed by Ernest Roger and J. A. Weber. The defendant, under reservation of all his rights to plead by way of exception or otherwise as he might thereafter be advised, urged that he could not plead without view and oyer of the document declared on and without view and oyer of the act of incorporation of the plaintiff company. The court ordered the plaintiff to file the documents called for. The defendant thereafter excepted that plaintiff was a foreign corporation, and that it had to aver in its petition that it had complied with the provisions of article 264 of the Constitution by which it would be authorized to do business in Louisiana. The court ordered the exception to be referred to the merits. Defendant answered under reservation of his exceptions.

He first pleaded the general issue. He then admitted his signature to the document sued on. Further answering, he alleged:

"That at the time of the signature made to the said document there was signed, at the same time, and same place, and as a condition precedent to the giving by respondent of his said signature, another document in the words and figures as follows:

"'Greenwood Plantation, Thibodaux, La.,
June 11, 1906.

"'This is to certify that the Advance Thresher Company of Battle Creek, Mich., agrees to send a man from the factory to give the thresher and engine 20 days' trial before accepting the same, and that in the event of cash payment the company is to allow 8 per cent. discount.      J. A. Weber.'

"Which said document and agreement and copy of agreement signed at the time is hereunto annexed as part of this answer and made part hereof for greater certainty.

"That the person, J. A. Weber, who signed the said document, was the person and the only person with whom your respondent dealt in this matter, and with whom whatever of contract there was was made. He represented himself at the time to be the selling agent of the present plaintiff. That your respondent stated at the time that, without the guaranty and agreement made in the said contract so signed by the said Weber, your respondent would not agree to buy or take the property offered for sale, and without this additional agreement would not sign the agreement aver-

red upon by the plaintiff and annexed to these proceedings under the prayer for oyer.

"That the said Weber, acting as aforesaid, declared he was the agent of the plaintiff and acted as such, making the bargains averred upon and disclosed by the written agreement made part of the petition herein, and also the agreement witnessed by the document hereto annexed and signed by him, the said Weber.

"That without the signing and agreement so shown by the said document, your respondent had refused to sign or agree to purchase, and was induced so to sign and agree only upon the conditions therein set out, and that if the same be in violation of the powers and rights of the said Weber, which respondent denies to be the fact, then there was no agreement and no contract; both parties not having agreed to the same thing.

"That after the said agreements were signed, the plaintiff, or some one for it, did show to your respondent the articles and machinery set out in the contract alleged upon, and the same was received by your respondent, who thereupon patiently waited for the appearance of the workman who was to give it '20 days' trial,' in accordance with the said contract and agreement, but that the plaintiff herein entirely failed and refused to perform the said condition upon which it had made the alleged contract of sale, and has since persistently refused so to do.

"That at the time of entering into the said contract and subsequently the said J. A. Weber, acting as the agent and seller of the plaintiff, and as such seller having the right to explain and warrant what the articles were that he was selling, explained and warranted that the thresher and machinery would work up, thresh, and separate the hay from the corn to the extent of 40 cart loads per day, but that the said machine, after due trial, with competent workmen and engineers, did not and cannot thresh and separate more than 10 to 15 cart loads per day, and thus causes great and heavy losses to the planter trying to use the same.

"That the faults of the machinery were specially called to the attention of the plaintiff and its agent, but that, despite such notice it continually failed and neglected and refused to send a workman or man from the factory to give the said machine, thresher, and engine the 20 days' trial before its acceptance, as it had bound and promised itself to do through its selling agent, and as it was bound to do under the contract entered into at the time of the signature of the contract averred upon. That by this failure to perform its part of the contract the said contract became null and void, if it ever had any existence, and the agreement of your respondent to buy and pay for the articles became utterly null and void without consideration; the said articles agreed to be sold not being of any use or service, and being not fitted for the purposes for which they were bought and not fitted for the purposes for which they were sold under the said agreement entered into as aforesaid.

"That it would be inequitable, unjust, and illegal to hold your respondent to pay for an article not fit for the uses for which it was intended and for which it was guaranteed, and further that by the illegal and fraudulent acts of the plaintiff in failing to make good its promise, made by its selling agent, to send a man from the factory to put the machinery in working order and to demonstrate its capacity to do the work for which it was intended and warranted, your respondent has been caused great harm and damage, in this: That respondent, in order to be in utter good faith, did, with the best management and workmen at his command, try to make the said machinery work so as to perform the functions for which it was intended, and to thus save the plaintiff from loss and damage. That for this purpose he endeavored to work the machinery, and did so at a heavy loss, trying to run and work the machinery during the 4th, 5th, 6th, 7th, and 8th days of September, 1906. That the expense of so operating the said machinery was, for labor and work done thereupon, during the said days, the sum of $32.85 for labor paid for, and 50 barrels of coal used and burned in running the machinery, the said coal being worth 60 cents per barrel, or in all the sum of $30. That respondent was put to the expense of hauling the said machinery from the depot of the railroad to his plantation, a distance of some 6 miles, at a cost of $10.85. That respondent was forced to buy an extra belt for the purpose of trying to run the said machinery, at a cost of $53.20, and which belt is useless to him, and which he now tenders to the said plaintiff. That besides your respondent paid the railroad for freight upon the said machinery the sum of $155.17—all of which your respondent has the right to and now prays have repaid to him by the plaintiff. That further to safeguard and house the said machinery for the sake of avoiding a greater loss to the plaintiff, respondent has housed and guarded the said machinery at a cost of $3 per month from the 9th day of September till this date at a loss and cost of $3 per month, the said cost now amounting to the sum of $24, with a continuing cost of $3 per month until it is taken away and removed from the premises of respondent, where it now is, and from which respondent has repeatedly requested the plaintiff to remove it.

"Wherefore respondent prays that the demand of the plaintiff be rejected at its cost, and that respondent have judgment against it in reconvention for the sum of $306.02, with legal interest thereon from the date of this demand, and reserving to it the right to recover the further sum of $3 per month for every month it shall leave the said machinery upon the premises of respondent after the filing thereof."

Annexed to the answer was the following document (D–1):

"Greenwood Plantation, Thibodaux, La.,
June 11/06.
"This is to certify that the Advance Thresher Company of Battle Creek, Mich., agrees to

send a man from the factory to give the thresher and engine 20 days' trial before accepting same, and that in the event of cash payment the company is to allow 8 per cent. discount.

                     "[Signed] J. A. Weber.

"Filed May 8, 1907.

         "[Signed] P. J. Aucoin, D'y Clerk."

The district court rendered judgment in favor of the plaintiff against the defendant condemning and commanding him to execute in favor of the plaintiff, under date of September 1, 1906, his three certain promissory notes, each for the sum of $729, bearing interest at the rate of 8 per cent. per annum from date until paid, payable annually, and due on or before December 15, 1906, December 15, 1907, and December 15, 1908, respectively.

"It is further ordered and decreed that plaintiff do have and recover judgment against defendant for the sum of $50, with 5 per cent. per annum interest thereon from September 1, 1906, until paid.

"It is further ordered, adjudged, and decreed that, in default of the execution of the three notes as herein decreed by defendant in favor of plaintiff, plaintiff do have and recover judgment against defendant for the full sum of $2,187, for damages for failure to comply with the written contract herein sued on, with 8 per cent. per annum interest from the 1st day of September, 1906, until paid, together with all costs of these proceedings.

The following reasons were assigned by the judge for the judgment:

"The evidence shows that J. A. Weber, acting as agent for the plaintiff company, called upon the defendant and solicited his order for a corn husker, shredder, feeder, and bagger, and engine to run the same.

"At the first meeting the merits of the machinery were discussed, but no agreement was reached nor sale made. A few days later the agent, Weber, returned and presented to defendant and his son and general manager, L. C. Roger, a contract of sale. The manager, Mr. L. C. Roger, testifies that the contract was presented to him, and he read it over; but he afterwards stated that he read a part of the contract only. The defendant, Ernest Roger, testifies: That the contract was presented to him; that he read it; that it was explained to him by the agent, after which it was signed by the agent and by him; that, before signing the said contract, it was agreed that an expert should be sent to operate the machine for a certain number of days, and at the request of defendant the certificate described in defendant's answer was drawn and signed by the agent at the same time that the original contract was signed.

"The defendant testifies that without this additional agreement the original contract would never have been signed by him.

"The original contract contains no erasures or interlineations and is signed by the defendant, E. Roger, and by J. A. Weber, agent, by whom it was to be sent to the factory for approval. The indorsement on the contract shows that it was approved by V. E. Bush, one of the officers of the plaintiff company, and was by him sent to the agency at Crowley, La., for acceptance, and the same was accepted by M. H. Adams, at Crowley, La. The machinery was shipped and delivered by plaintiff to the defendant at his Greenwood plantation; the defendant paying the freight on same, as stipulated in the contract. Upon the delivery of the machinery, plaintiff, as was its custom, sent two experts to erect and start the machinery.

"The machinery was erected on the last day of August, but was not operated until Tuesday, September 3d, because the hay up to that time was not sufficiently cured. It may not be out of place to here state that, while the contract was made with E. Roger, yet the machinery was delivered to the Ernest Roger Company, Limited; the plantation having in the meanwhile been incorporated, and Mr. E. Roger being the president of the corporation, and Mr. L. C. Roger its vice president and general manager. The two experts Messrs. Altic and Cooper operated, or rather superintended, the operation of the machinery on September 3d. The evidence bearing on the first day's operation is contradictory; the two experts claiming: That the machinery ran smoothly and did the work satisfactorily, shredding the hay and husking the corn, save when the pea vine hay and corn was fed in large bundles, which caused the machine to choke at times. That they protested and requested that the machine be fed in small quantities by means of a hay fork, instead of by means of a hoist operated by a mule. That, notwithstanding this protest, the manager insisted on feeding the hay with the mule and the hoist, instead of by an ordinary hay fork, stating that it was too expensive to feed the machine by hand. On the other hand, Mr. L. C. Roger, general manager, and Mr. Kerne, the overseer, testify that the machine frequently choked up whether fed by hand or by the mule hoist, and that it shelled a considerable amount of corn. When the two experts left in the evening, the overseer requested them to return the next day. Both of the experts testify that, on reaching Thibodaux, they called to see the general manager, Mr. L. C. Roger, who resided there, and had a conversation with him relative to the machine.

"Mr. Roger says he does not remember meeting the two experts at all that evening in Thibodaux, but that he will not positively swear that he did not see them. At this conversation it is claimed by both Altic and Cooper that, wishing to go to Southdown to start

another machine, they asked him whether they should return to Greenwood the next day; that Mr. Roger said it was not necessary. They then stated to him they had come to get the notes signed, and Mr. Roger told them to go on to Southdown, and that he would sign the notes when they returned.

"Both experts then went to Southdown, and both testify that on the 5th Mr. Altic returned to Thibodaux, leaving Mr. Cooper at Southdown. Mr. Altic testifies that he returned to Thibodaux in order to get the notes signed, and that he called on Mr. Roger for that purpose. Mr. Roger testifies that both Cooper and Altic were present at the conversation had on September 5th. At this conversation, Mr. Altic testifies that, when he told Mr. Roger that he was going to the plantation to get the notes signed, Mr. Roger told him it was unnecessary, as his brother, who was secretary of the company, had to sign them, and he was absent. That upon stating to Mr. Roger the importance of having the notes signed, before he returned to Crowley, Mr. Roger suggested that he leave the notes with him, and that he would have the notes signed the next day and forward them by mail. Before agreeing to this, Mr. Altic said he would have to communicate with the manager, Hr. Adams, by phone at Crowley, and left Mr. Roger for this purpose. Upon receiving instruction from his manager that he could leave the notes with Mr. Roger, provided that Mr. Roger promised to have the notes signed and forwarded on the next day, Mr. Altic stated that these instructions were communicated to Mr. Roger, who said it was all right, just to leave the notes with him, and he would have them signed and would mail them the next day. Mr. Altic also testified that Mr. Roger expressed his satisfaction with the outfit, and stated that it was doing good work.

"On the other hand, Mr. Roger denies that he agreed to have the notes signed and forwarded the next day, but says that he told Mr. Altic that the machine was doing pretty good work, and that the notes could be left with him, and that, if the machine continued to give satisfaction, he would have the notes signed and forward them by mail. Mr. Roger also testifies that he requested Mr. Altic to return as soon as he had done some work that his manager wished him to do. This is denied by Mr. Altic. This conversation was held late in the evening, and on the same day (September 5th) the Ernest Roger Company, Limited, through its manager, L. C. Roger, wrote a letter to the plaintiff company, complaining that the husker shredder would not handle 30 to 40 loads per day, as represented, and it has thus far handled but 10 loads in that time; that, as this was far from the required capacity, they would not be able to use the machine economically, if at all. This letter also stated that 'Your two men did not show up,' and, after referring to the fact that one of the bars of the machine had broken, closes by making the request to be heard from.

"There seems to have been no reply to this letter, as none was offered by either party. Thereafter there was some correspondence between the plaintiff and the defendant as to the quantity of the work being done by the machine, to which reference will hereafter be made in this opinion. On September 21st the defendant for the first time writes the plaintiff calling attention to the certificate given by its agent, J. A. Weber, in reference to 20 days' trial before acceptance, and stating that they were advised that, as this certificate was made at the same time that the contract was signed, it was a part of the same, or else no contract was made. After stating that they had waited patiently for the workmen to be sent by plaintiff, and further stating that the machine would not do the work and was worthless, defendant closes by stating that the machinery had been stored subject to plaintiff's orders. To this letter plaintiff replied that settlement must be made agreeable to the original contract, as this was the contract that had been accepted, and no attention would be paid to any other. On the witness stand plaintiff's manager at Crowley testified that he knew nothing of the certificate given by Mr. Weber, that it was never sent or communicated to him, and that the contract would not have been accepted on any such terms and conditions.

"The learned counsel for the defense contends that as the certificate given by the soliciting agent, Weber, as signed at the same time as the printed contract, it forms a part and parcel of the same, and that, if plaintiff did not accept the conditions of the certificate which is a part of the contract, then there was no agreement between the parties and hence there was no contract.

"The printed contract contains the following, among other stipulations:

" 'Notice.

" 'It is expressly understood that the agents, salesmen and experts of this company have no general powers, and are only authorized to make sales upon this form, and that all agreements appertaining to this order are included in the above, and that the warranty is the only one, and only form made or authorized by the Advance Thresher Company to be given on the above machinery, and failure to follow same waives and settles all claims for damages for any cause and any and all claim or right to recoup for damages or injury in any suit brought to collect the purchase price. The fact of any agent, expert or employé of this company being sent to this machinery or working on the same shall not change or modify this contract or the terms or conditions of the warranty on the back hereof. * * *

" 'That no agent, expert or other person shall or can make any different warranty or vary or modify any of its terms or waive any of its conditions, and that any attempt to do so shall not bind the Advance Thresher Company or affect this contract. Changes can only be made by the board of directors or treasurer and then only in writing.

" 'It is understood by us that all agreements with the Advance Thresher Company must be made in writing, and that no verbal agreement shall be recognized or claim under the same made by parties hereto.'

"Under the title of 'Warranty of Advance Machinery,' on the reverse side of the printed contract, will be found the following stipulation:

" 'It being understood by the party giving this order that no one except the treasurer or the board of directors of the Advance Thresher Company is authorized to make or can make for the company any other warranty or modify, change or alter the terms or conditions of the warranty or the printed order and then only in writing.'

"As has already been seen, the defendant was cognizant of the stipulations and conditions just recited, he having read the same, and the question here presented is: Can the defendant, with the full knowledge that the agent was without power or authority to change or alter the printed contract or make any additional warranty thereto, avoid the contract and claim that no agreement was made, because the agent at the time this contract was signed gave a certificate containing conditions contradictory to those set forth in the printed contract? This question would be answered affirmatively, if it had been shown that the machinery had been shipped and delivered by the plaintiff company with knowledge that the agent had exceeded his authority by giving the certificate referred to.

"The evidence shows, however, that the agent never communicated the fact that he had signed any such certificate, and the first that plaintiff knew of this certificate was communicated to it on September 21st, when, in a letter to plaintiff's manager at Crowley, the defendant for the first time called attention to the certificate and gave it as a reason for refusing the machinery and settling for the same. The defendant seems to have been indifferent as to whether the plaintiff was informed of this certificate or not. It was drawn and signed in his office and was by him attached to the printed contract and placed in his safe. It is not shown that it was signed in duplicate, and, as he states that he kept the certificate, the presumption is that it was not. The defendant seems to have relied on the word of the agent, Weber, whom he knew personally, and yet he at the same time knew that Mr. Weber could make no conditions other than was contained in the printed contract.

"Counsel for the defendant has cited authorities to the effect that the contract can be avoided when entered into through error or fraud, and that the principal is bound when the knowledge of the agent's act is brought home to him. Newman v. Scarborough, 115 La. 860, 40 South. 248, 112 Am. St. Rep. 278; Hodge's Heirs v. Durnford, 1 Mart. (N. S.) 115; Elam v. Carruth, 2 La. Ann. 275; E. O. Standard Milling Co. v. Fowler, 46 La. Ann. 320, 15 South. 16; Johnson v. Inerarity, 4 Mart. (N. S.) 11.

"In the present case no fraud or error is alleged, nor is there any proof in the record that defendant acted in error. On the contrary, he read the contract and was fully informed that the agent's powers were limited, and that he was without authority to sell the machinery on any other conditions, written or verbal, save those specifically set forth in the contract. The principal in this case had no means of knowing, as did the defendant, that the agent had exceeded his authority. Hence the authorities cited by defendant's counsel do not apply.

"The stipulation in the printed contract, signed by both parties, limiting the powers of the agent, is binding on the parties to the contract, and the principal cannot be bound by any written certificate reciting conditions contradictory to and destructive of the terms of the contract, unless the certificate or the contents thereof were brought home to the principal. New York Life Insurance Co. v. Fletcher, 117 U. S. 525, 6 Sup. Ct. 837, 29 L. Ed. 934.

"In the cause just cited the court held that one who signs a written contract is presumed to have read it, and be cognizant of the limitations therein expressed.

"In the present case the defendant admittedly read the contract, was cognizant of the limitations placed on the agent's authority and now seeks to either evade that contract or hold the plaintiff company bound by a certificate given by its agent exceeding its authority, and which was never in any way communicated to the plaintiff. The plaintiff company received the contract duly signed by its agent and the defendant, and acting thereon it manufactured, shipped, and delivered the machinery to the defendant, and the latter cannot now evade the contract on the ground that the agent gave an unauthorized certificate, when the defendant knew that the agent had no such authority, and when neither the certificate nor its contents were made known to the plaintiff. See, also, Fulton v. Sword Medicine Co., 145 Ala. 331, 40 South. 393; McKenzie v. Bacon, 41 La. Ann. 15, 5 South. 640; Chaffe v. Ludeling, 34 La. Ann. 967.

"But even though we admit that the plaintiff company is bound by the unauthorized certificate given by its agent, would the defendant be in any better position? Was the condition imposed in the certificate of the agent violated, and, if yes, was the violation active or passive? A review of a portion of the evidence will be of material assistance in solving these questions.

"The plaintiff company, as was its custom, sent two experts, Altic and Cooper, to erect the machinery and start it to work. The machinery commenced work on September 3d, and on the same evening the two experts came to Thibodaux and there met the vice president and manager, L. C. Roger, with whom they had a conversation. Both experts testify that Mr. Roger stated that it was unnecessary for them to return the next day, and told them to go to Southdown. Both experts testify that, when spoken to about a settlement, Mr. Roger replied that he would sign the notes when he returned from Southdown. It is true that Mr.

Roger denies having made the latter statement, and while this court, knowing Mr. Roger as it does, is satisfied he swore to the facts as he remembered them, yet his recollection in regard to the conversation with the experts is not so clear as it might be. For instance, he states that he does not remember having had any conversation with the experts in Thibodaux on September 3d, but states that he will not swear that he did not meet and converse with them on that day. And, again, he states that the conversation had by him on September 5th, relative to the signing of notes, was with both Altic and Cooper, and it is shown that Cooper was still on Southdown plantation, and that only Altic was in Thibodaux at that time. Altic testifies that, when he returned from Southdown late in the evening of September 5th, he called to see Mr. Roger at his residence and told him that he was going to the plantation to get the notes signed; that Mr. Roger stated that it was unnecessary, as the secretary of the company, who would have to sign the notes, was absent, but to leave the notes with him, and he would have them signed and forward them by mail. To this Altic demurred and then called up his manager by phone, who instructed him to leave the notes with Mr. Roger provided he agreed to have them signed and forwarded the next day. This Altic says Roger agreed to do, but Roger denies that he made any such statement, but says that he did agree to have the notes signed provided the machine continued to give satisfaction. Mr. Roger admits having told Altic that the machine was working satisfactorily at that time, but says that he requested him to return as soon as possible. The request to return is denied by Altic; but, be that as it may, it remains that Mr. Roger did express satisfaction with the working of the machinery at that time, and yet the only letter written by the defendant that mentions the experts was written this same day, and some time previous to this conversation, as it is shown to have been received in Crowley on the following day. This letter was written by Mr. L. C. Roger personally, and, in referring to the experts, merely says, 'Your two men did not show up.'

"In his subsequent letters the defendant at no time mentioned or called on plaintiff to send experts. He merely complained that the machine would not do the work that it was guaranteed to do, while the plaintiff denied that it had made any such guaranty. It was not until September 21st that defendant by letter called plaintiff's attention to the certificate signed by the agent, Weber, and stated that he refused the machinery because plaintiff had not complied with one of the stipulations therein imposed by sending a man from the factory to give the machine a 20 days' trial. Up to this time the only complaint made in regard to the machine was that it could not do the work of a plantation of the size of Greenwood, and the letter of September 21st, refusing the machine because no expert had been sent to give it a

20 days' trial, seems to have been an afterthought, as the defendant states in his letter.

"We are advised that this (certificate), being a part of the agreement at the time of same, and by the person offering to sell the machinery, forms part thereof, else no agreement was made.

"From the foregoing it will be seen that the defendant at no time called on plaintiff to send an expert to operate the machine for 20 days, and the question of experts was never mentioned except in the letter written before the conversation with Altic, at which the defendant's general manager expressed himself as satisfied with the working of the machine.

"Several letters were written by the defendant to plaintiff after this, and in none of them did he ask for an expert, or even complain that none had been sent. It was not until September 21st that the condition contained in the agent's certificate was referred to, and in this letter an expert was not demanded, but the plaintiff was advised that the machinery was refused and held subject to plaintiff's order.

"Admitting therefore that the certificate of Weber was a part of the contract, and the plaintiff bound thereby, the violation alleged and proved was a passive violation only and required a putting in default, which was never done. Civ. Code, art. 1933; Defee v. Covington, 37 La. Ann. 661.

"The defendant next contends that the machine would not do the work that it was guaranteed to do. On this branch of the case the court admitted evidence, subject to the objection of plaintiff's counsel, the tendence of which was to prove that the machinery did not do the work that the agent, Weber, verbally represented that it would do previous to the signing of the contract. The contract sued on being written, and there being no allegations in defendant's answer of fraud or error, it follows that parol evidence was inadmissible to prove what may have been said before or at the time of the making of the contract or since. Civ. Code, art. 2276.

"The objection of plaintiff's counsel is therefore sustained, and the evidence excluded.

"The defendant further contends that the contract is null and void, in that the machinery was unfitted for the purpose for which it was sold. The only warranty made in the written contract is to the effect that the machinery is of good workmanship and material, and, if properly worked, is not excelled by any other machinery for a like purpose.

"It is therefore doubtful, to say the least, whether defendant can attack the contract on the ground that the machinery was unfit for the purpose for which it was purchased. Dreyfus v. Lourd, 111 La. 21, 35 South. 369.

"But after giving the evidence due weight and consideration, the court finds itself unable to reach the conclusion for which the defendant contends. Considerable evidence was taken under commission by the defendant in support of this contention. Several witnesses for

the defense testify that a trial of a similar machine on the Shadyside plantation in St. Mary's parish was a failure, and that the machine would not do the work. The plaintiff's witnesses are equally positive that the machine did do the work, and claim that such stops and delays as did occur were due to a lack of steam.

"The preponderance of evidence is to the effect that the machine did not give satisfaction, but it seems that a settlement is being demanded, and the matter is about to be litigated. It also showed that a trial was made of a similar machine manufactured by plaintiffs on the Rose Hill plantation, parish of Vermillion. Only two loads were put through the machine, it being the end of the season, and the general manager testified that the machine did not do the work as rapidly as had been represented, but that he was satisfied with the statement made by plaintiff's representative that the quantity used was too small to be taken as a criterion. He also testified that one of the loads, after passing through the machine, was damp and heated; but, as the written contract makes no guaranty in this regard, the court excluded the evidence.

"It is further shown that a machine identical in make and capacity was sold by plaintiff to the Southdown plantation, and Mr. John D. Minor, one of the owners of the plantation, testified that the character of the work done by the machine was quite satisfactory, but its capacity was much less than represented.

"Mr. V. H. Kyle, manager of the same plantation, testified that the machine did work all right, but that they could not feed the machine fast enough. He further testified that the capacity of the machine is about 30 loads a day, and that it will not do the work of a plantation as large as Southdown. This machine was settled for by the owners of the Southdown plantation.

"Previous to the trial of this case, the only complaint made by defendant as to the working of the machine was similar to that of the Southdown people; that is to say, that the machine did not do a sufficient quantity of work considering the size of the plantation.

"In his letter to the plaintiff's manager, the defendant complains that the machine would only work up 16 loads in a half day; whereas, the agent, Weber, represented that it would work up 30 to 40 loads in that time. No other fault is mentioned in defendant's letters, but on the trial defendant complains that the machine shells some of the corn, and yet it is admitted that no complaint was ever at any time made on this score. On September 5th the general manager of the defendant stated to plaintiff's expert that the machine was working satisfactorily and was doing good work. It seems therefore that the machine was at that time considered fit for the purpose for which it was intended.

"It may be that the machine had not the capacity to take care of all the pea vine hay and corn grown on a plantation the size of Greenwood, and it may be that the agent, Weber, previous to the signing of the contract, represented that the machine has such capacity; but the contract contains no such guaranty, and the plaintiff is not bound by the verbal representation of the agent, Weber. Both parties are bound by the written contract.

"On the faith of this contract, the plaintiff company manufactured, shipped, and delivered to the defendant the machinery contracted for, and the defendant agreed to settle for same by notes upon its receipt and delivery. The plaintiff having complied with all of its obligations, it is now incumbent on the defendant to pay the consideration set forth in the contract. For the foregoing reasons, let there be judgment for the plaintiff as prayed for and rejecting defendant's reconventional demands."

In the syllabus of the brief filed in behalf of the defendant, the following propositions were contended for:

(5) While an agent may be limited in his right to bind the principal, still, when he is authorized to offer for sale, he has the right to receive the propositions made by the would-be purchaser, and these offers or counter propositions must be communicated by him to the principal. If not communicated, either through the ignorance or fraud of the agent, there can be no contract between the principal and the third person until finally acted on.

(6) The agent may exceed his authority. When he does so, he cannot bind the principal; but, when such counter offers are made conditional to accepting the offer made, there can be no acceptance by the principal without also accepting the counter offers or proposals. He must accept all or none. Findley v. Breedlove, 4 Mart. (N. S.) 115; Newman v. Scarborough, 115 La. 866, 40 South. 248, 112 Am. St. Rep. 278; Leeds v. Caldwell, 1 Rob. 256; Wolf v. Rogers, 6 Rob. 97; Elam v. Carruth, 2 La. Ann. 275; E. O. Standard Milling Co. v. Fowler, 46 La. Ann. 320, 15 South. 16; McDonough v. Winchester, 1 La. 190; Stockton v. Firemen's Ins. Co., 33 La. Ann. 580, 39 Am. Rep. 277.

(7) Fraud of the agent cannot be accepted by the principal without accepting the in-

firmities it is subject to. Western Mfg. Co. v. Cotton & Long, 104 S. W. 758, 31 Ky. Law Rep. 1130, 12 L. R. A. (N. S.) 427.

(8) The written memorandum or agreement added by Weber° to the contract he was authorized to make formed an integral and inseparable part thereof. If he was not authorized to make it, and hence could not bind his principal, then there was no contract, no coming together of the minds. If the principal wishes to accept anything, he must accept the whole. He must take all or none. Bethel v. Hawkins, 21 La. Ann. 621; Civ. Code, arts. 1795, 1801–1805; Harnickell v. New York Life Ins. Co., 111 N. Y. 390, 18 N. E. 632, 2 L. R. A. 150.

(9) There must be a coming together of the two minds upon every phase of the contract, and until that is effected there is no contract. J. P. (Ledru-Rollin. Ed.) vol. 5, pp. 49–55; Primaire An. xiv. Everstein & Co. Claissenns C. Panneret, 57 J. P. Douai, Dec. 5, 1847.

## Opinion.

It is not disputed that in point of fact Weber was acting as an agent of the plaintiff, soliciting orders upon it for the purchase of its machines, and that that fact was made known to the defendant, for he was handed by Weber a copy of one of the orders so solicited for (18), with the terms and conditions thereof, accompanied by the written limitations upon the authority of the soliciting agent in respect to the same.

It is true that Weber had the right, independently of instructions, and outside of those limitations, to receive and convey to his employers any conditional offers to buy, which would in no manner bind them or those who might make such conditional offers, unless and until accepted by all parties, and that his employers were bound when they were communicated to them either to accept or reject them as made. The defendant in this case imagined that he had placed himself under the operation and protection of this rule, but he did not do so. He very incautiously signed a proposition to buy one of plaintiff's machines on the precise terms and conditions on which the company had proposed to sell the same, and handed the order so signed to Weber to be transmitted to the company, which was done. The order which was so sent, and which it acted upon, was not that which Rogers intended, and which it was Weber's duty to have communicated to it. That order was a proposition to it by Roger to have forwarded to him at Lafourche parish one of plaintiff's machines for examination and trial, to be followed by a purchase of the machine if it was found satisfactory after such trial. Acceptance of the machine was to be made if it was found to meet existing planting conditions in Louisiana. This complete change from the terms and conditions contained in the printed orders left by the company with Weber was contained in a separate detached piece of paper signed by Weber, in which the latter recognized the terms and conditions under which the machine was to be sent to Roger and be by him received. The existence of such a paper was not made known to the plaintiff until after the husker and thresher had been received by the defendant. Plaintiff (so far as the record shows) acted in good faith. Any loss which the defendant will suffer in the premises will be the result of his misfortune in not knowing what he was called upon to do, to guard his own interests, and in trusting Weber. If a loss has to follow from those facts, it will more properly have to fall upon the defendant than upon the plaintiff.

We find no legal ground for reversing the judgment appealed from. It is hereby affirmed.